[Cite as *In re Z.C.*, 2014-Ohio-3290.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| | | CASE NOS. CA2014-02-049 |
| Z.C., et al. | : | CA2014-02-050 |
| | : | O P I N I O N |
| | | 7/28/2014 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2011-0356

Jeannine Barbeau, 3268 Jefferson Avenue, Cincinnati, Ohio 45220, guardian ad litem

Dawn S. Garrett, 9435 Waterstone Blvd., Suite 140, Cincinnati, Ohio 45249, for appellant, T.W.

Michael T. Gmoser, Butler County Prosecuting Attorney, Kimberly L. McManus, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee, Butler County Children's Services

Gregory L. Peck, 3426 Indian Creek Road, Oxford, Ohio 45056, for A.W.

**PIPER, J.**

{¶ 1} Appellant, the biological mother of Z.C. and R.C., appeals a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of the two children to a children services agency.

{¶ 2} Appellant is the mother of three children. Her oldest child, S.C., who was four years old at the start of this case, has a different father. Prior to the start of this case, the three children lived with appellant and her husband, who is the father of the two boys involved in this appeal. At the start of the case, Z.C. and R.C. were two years and one year old, respectively.

{¶ 3} The Children Services Division of the Butler County Department of Job and Family Services began working with appellant's family in January 2011 after the agency received a referral regarding the condition of the home. A caseworker visited and found the home in poor condition, with dirty dishes all over the kitchen, dog feces and urine on the floor and an infestation of roaches. On a visit the following day, the worker observed Z.C. for the first time and noticed bruises on his arm and red marks in a row on his back. Because of behavioral and developmental issues, the children were referred to the Help Me Grow program.

{¶ 4} A second referral was received in March 2011 involving the condition of the home. Middletown Police were also called and found dog and cat feces throughout the home, including in the children's bedrooms. They also found an infestation of bugs and many dirty diapers on the floor. The police officers did not feel it was a safe environment for the children and S.C.'s father took all three children for two weeks until the parents could improve the condition of the home enough for the children to return home. Although there was some improvement, concerns regarding the condition of the home continued over the next months, including problems with animal feces in the house and on the children's blankets, the children's beds were nailed to the floor without sheets, multiple animals were in the home, the children were dirty and had lice. It was also reported that the children were displaying behavioral problems, and there was minimal food and the children appeared

hungry. The caseworker reported that appellant would make some improvements, but the home would soon return to disarray.

{¶ 5} The agency worked with the family for around seven months and provided resources to aid improvement, including the Development of Living Skills (D.L.S.) program. However, because many of the problems persisted and additional concerns surfaced, on August 15, 2011, the agency filed a complaint alleging that the children were neglected and dependent. At a hearing on the complaint, a caseworker explained that the agency gave the family time to make improvements, but the parents were not following through with the recommendations to get the help they needed. She indicated that all three children were displaying behaviors that were concerning and the condition of the home had deteriorated. In particular, the agency was concerned about an incident in which Z.C. sat on S.C. and wrapped a phone cord around her neck. The caseworker also testified that with regard to the condition of the house, the parents said they were moving out of the roach-infested house at the beginning of August, but had not, so the agency filed the dependency and neglect complaint.

{¶ 6} The trial court found that the children were neglected and dependent. Z.C. and R.C. were placed in a foster home on removal and throughout the case have remained in that same foster home. S.C. was placed in the custody of her father and is not a party to this case involving her half-brothers.

{¶ 7} A case plan was prepared that required the parents to complete the D.L.S. parenting program, maintain stable housing and income, limit the total number of pets in the home to no more than two, complete mental health evaluations and recommendations, and participate in family therapy and counseling. The parents were also granted supervised visitation, with the opportunity for liberalized visitation. Although there was some

improvement at times, over the course of the case, the level of progress by the parents was inconsistent.

{¶ 8}  Early in the case, a psychological evaluation was completed for Z.C., which indicated he engaged in aggressive behavior with his siblings and children at daycare, throwing his head back when angry.  It was also reported that Z.C. had nightmares frequently when he was at home, but since being in foster care the nightmares and incidents of throwing his head back had reduced.  It was also reported that his behavior had improved with the use of redirection, but the child still required constant supervision.  It was further reported that the child gorges himself on food, was behind on his shots and there were concerns with speech and balance problems.  The psychologist concluded that Z.C. was behaviorally responding in ways that reflect the environment he was living in and diagnosed adjustment disorder with mixed disturbance of emotions and conduct.  The psychologist recommended family counseling and that the parents participate in parenting classes to learn the fundamental skills of parenting.

{¶ 9}  D.L.S. began working with the family for a second time.  Reports from the program indicate that the parents felt they knew how to parent and disputed the information provided by D.L.S. workers.  Reports indicated the parents had an inability to understand the health issues involved with a home that was not kept clean and that the parents frequently gave excuses why they were not able to maintain the home.  Reports also indicated the parents had expectations that were out of line with what small boys were developmentally capable of doing.  The D.L.S. worker concluded that the concerns/weaknesses of the parents were not due to a lack of ability or skills, but instead were due to a lack of motivation and a resistance to follow through with the skills acquired.  The worker concluded that the parents have the skills and knowledge, but due to a lack of motivation and consistency in many areas they only marginally completed the program.

{¶ 10} The parents and children also were provided in-home family therapy. The family therapist provided notes of the therapy sessions. Within these notes, the therapist indicated that the parents verbalized they do not want to change their parenting practice and feel there is nothing they need to improve.

{¶ 11} The agency eventually filed for permanent custody of Z.C. and R.C. on January 23, 2013. At the hearing, an agency supervisor, appellant, father and grandmother testified. The agency supervisor testified that the agency's concerns that led to filing the permanent custody motion include an unstable living environment, lack of income, an inability of the parents to apply what they learned at D.L.S. and at family counseling, and the failure to complete case plan services.

{¶ 12} Appellant testified that the children have expressed to her several times that they want to go home with her. She stated that she is living in her mother's three-bedroom house. The people currently living in the house include appellant's mother, the children's father and an aunt and uncle, although, according to appellant, the aunt and uncle were planning on moving out of the home in a week. The house is owned by the grandmother's common law husband who is living in Louisiana. Evidence was presented to show that the house is in foreclosure and that there are three dogs, a cat, a ferret and a rabbit in the home. The grandmother testified that the house is not in foreclosure and the bank is working with her "husband" so that he can keep the property. In her testimony, the boys' grandmother also indicated that she wanted the children to go back with their parents, but if it was not possible, she asked that she be considered as an alternative placement.

{¶ 13} In addition to the testimony at the hearing, documentary evidence in the form of social summaries, D.L.S. reports, family therapist reports, counselors' reports, and psychological evaluations of Z.C. and his parents were all admitted into evidence.

{¶ 14} After considering the evidence, a magistrate determined that it was in the best interest of the children to grant permanent custody to the agency. The trial court overruled objections and adopted the magistrate's decision.

{¶ 15} Appellant now appeals the trial court's decision to grant permanent custody to the agency. She raises the following sole assignment of error for our review:

{¶ 16} THE COURT'S DECISION AND ORDER OF PERMANENT CUSTODY AND DENIAL OF LEGAL CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE TRIAL COURT'S FINDINGS AND THE EVIDENCE PRESENTED FAILED TO MEET THE REQUISITE CLEAR AND CONVINCING STANDARD.

{¶ 17} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re Starkey*, 150 Ohio App.3d 612, 2002-Ohio-6892, ¶ 16 (7th Dist.). A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *In re Rodgers* (2000), 138 Ohio App.3d 510, 520 (12th Dist.).

{¶ 18} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). Second, the court must find that any of the following apply: the child is abandoned; the child is orphaned;

the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; or where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a), (b), (c) and (d); *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 22.

{¶ 19} The juvenile court found by clear and convincing evidence, and appellant does not dispute, that the children have been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period as of the date the agency filed the permanent custody motion. However, appellant does dispute the juvenile court's finding that granting permanent custody of the children to the agency is in the children's best interest. Specifically, appellant argues that appellant has a bonded relationship with the children, along with a home and income, making permanent custody inappropriate.

{¶ 20} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 21} With respect to R.C. 2151.414(D)(1)(a), the juvenile court found that the parents were consistent in attending visits when the visits occurred in their home with the D.L.S. instructor or the family therapist. The court indicated that due to the parents' unstable living situation, visits were moved to Family Connections in February 2014 and visits remained at the center. The court found that concerns have been raised by persons supervising and observing the visits regarding the parents' inability to consistently demonstrate implementation of the parenting skills they have been taught through the D.L.S. program.

{¶ 22} The court indicated that appellant testified that Z.C. did not want to leave her and that the child has run into the street to avoid getting into the foster parent's car. In addition, appellant testified that R.C. stated in family counseling that he is afraid of never seeing his mother again. The court found, however, that the family therapist's report indicates that the children are avoidant with regards to their parents. In addition, the court found that the foster mother reported that during the week after visits, the children do not talk or ask about their parents. The family therapist reported that in a family session on August 15, 2013, the children appeared to be emotionally withdrawn.

{¶ 23} The court further indicated that the children have resided in the same foster home since their removal and that the guardian ad litem reports that both children are happy and comfortable in the foster home and bonded to the foster parent.

{¶ 24} With respect to R.C. 2151.414(D)(1)(b), the juvenile court indicated that it did not conduct an in camera interview with the children, but considered the report of the guardian ad litem, who recommended that the children be placed in the permanent custody of the agency.

{¶ 25} With respect to R.C. 2151.414(D)(1)(c), the juvenile court found that the children have been in the custody of the agency since August 15, 2011. The court further found that the agency filed for permanent custody on January 30, 2013 and the children had been in agency custody for 16 months at that time. Accordingly, the court found that the children had been in agency custody for 12 or more months of a consecutive 22-month period.

{¶ 26} With respect to R.C. 2151.414 (D)(1)(d), the juvenile court determined it was clear that the children needed a legally secure placement as they had been in foster care for approximately 25 months while the case was pending. The court found that while there was some evidence that the parents made some progress in developing better parenting skills, the agency presented evidence "replete with examples where the parents have resisted implementing certain skills and failed to address the safety concerns" delineated by the D.L.S. educator. The court found that before the complaint was filed, D.L.S. worked with the parents from March 2011 until July 2011 when services were terminated due to a lack of attendance. Then, as part of the case plan adopted by the court, the parents again participated in D.L.S. for a whole year.

{¶ 27} However, in her final report, the D.L.S. educator indicated that an ongoing issue with the parents was their strong belief that the children should "just know" to stay away from things and the parents expect this type of behavior from their very young children. The court indicated examples of what it indicated were "unrealistic expectations from the parents, which included the parents keeping medications and a tattoo table and supplies within areas the children could reach. The court found that despite discussions with the D.L.S. instructor and the family therapist, the parents refused to change the location of the medication and tattoo table, stating that the children should know not to touch certain things.

**{¶ 28}** The court also reviewed the evidence regarding home sanitation and found that when the children were attending visits in the home, it was vacuumed and clutter free, but daily routines of keeping other parts of the house clean were marginal, including things like black mold on the toilet bowl and dog feces on the stairs. The court found that the experts noted that these concerns/weaknesses were not due to the parents' lack of ability or skills, but were due to a lack of motivation and a resistance to follow through with the skills they acquired. The court found this lack of motivation and progress concerning because of the developmental and behavioral issues that have been diagnosed for the children after being placed in foster care.

**{¶ 29}** The court indicated that Z.C. is currently receiving occupational therapy and reviewed the findings of a psychologist who evaluated the child after his removal from the home. The psychologist determined that Z.C. "appears to be responding in ways that seem to reflect his environment he lived in." The psychologist indicated that being left unattended in his room most of the day is apparent in the way the child copes with stressors, such as throwing his head back when angry and that the child does not appear to have received much guidance or discipline. The psychologist noted that since being in foster care, Z.C.'s needs are being met and his behaviors have gradually decreased, but his symptoms of aggression could get worse if he is left in an environment where he is left unattended and is not receiving guidance or discipline from his caregivers. The psychologist noted that Z.C. is "at risk for developing Oppositional Defiant Disorder and other mental behaviors if the parents do not change the way they raise him."

**{¶ 30}** The court also found that the father and mother were referred to counseling, but both were discharged for lack of attendance. In addition, the court found that the mother and father failed to demonstrate a source of income. During the case, appellant only worked a few days through a temporary service and the father has had sporadic employment.

**{¶ 31}** The court reviewed the evidence regarding the sanitation issues in the home throughout the course of the case. The court noted that early in the case the condition of the home was "deplorable" and although the parents moved to a residence that was somewhat better, there continued to be problems, such as dog feces not being cleaned up, despite the D.L.S. instructor's urging the parents to do so. In addition, the court noted that it had ordered the parents to have no more than two pets in the home, but the parents failed to follow this ruling at times during the case and they are now living in a small three-bedroom home with four other adults, three dogs, a ferret and a rabbit. The court concluded that by their actions, the parents have demonstrated an inability to make good judgments, causing concern regarding the parents' ability to make good judgments about the safety of their children.

**{¶ 32}** The court also reviewed the parents' residences throughout the case and determined that they have moved several times, including living in a motel at one point, and that at the time of the hearing they were living in the grandmother's residence which is owned by the grandmother's "common law husband" who resides in Louisiana. The court found that no one living in the home has proprietary rights to the residence and the grandmother did not appear to be aware of the legal status of the house. The court was also concerned because the grandmother indicated in her testimony that a male friend of hers also lives in the house.

**{¶ 33}** Based on a review of the evidence presented, the trial court determined that the parents failed to demonstrate that they can provide for the needs of the children on a consistent basis. The court indicated the parents had to be prompted by providers several times before following any advice. The court concluded that although the parents have marginally improved their ability to parent, it is not in the children's best interest to "gamble on the possibility that the parents may in the future be able to obtain and maintain stability in their living conditions or to meet their children's developmental needs." The court concluded

that despite two years of involvement in multiple case plan services, the parents failed to rectify the issues which caused the children to be placed in foster care.

{¶ 34} The court also determined that no other appropriate relatives or persons are available to parent the children. The court indicated that the grandmother testified that she was seeking placement of the children with her. However, the grandmother failed to file a motion for legal custody, and did not complete the home study process. In addition, she lives in a home that appears to have a foreclosure proceeding pending. Based on a review of all the evidence under this factor, the court determined that a legally secure placement cannot be achieved without a grant of permanent custody to the agency.

{¶ 35} Based on a review of the factors for determining the best interest of the children, the trial court found by clear and convincing evidence that granting permanent custody of the children to the agency was in the children's best interest. On appeal, appellant argues that the parents cured the underlying home sanitation issues and that the R.C. 2151.414(D)(1) best interest factors weigh in her favor because the children are bonded with her and the grandmother and want to come home, and that a legally secure placement can be achieved without a grant of permanent custody to the agency.

{¶ 36} However, after a thorough review of all the evidence submitted in this case, we find the trial court's decision is supported by the record and is not against the manifest weight of the evidence. Although the parents were given six months before the complaint was filed, and over two years before the permanent custody hearing began, the problems with the home and their parenting still existed. Although there was a measure of progress at certain points in the case with the house, the parents failed to consistently maintain a clean, safe and stable home for the children.

{¶ 37} In the same manner, although the parents participated in the D.L.S program two times, they were unable or unwilling to implement the lessons and provide a safe

environment for the children and to meet their developmental needs. Evidence was presented to show the psychological problems the children had from their environment and the progress made by the children in the foster home. Evidence was presented to show that placing them back in that environment would be harmful, and that the parents were unable or unwilling to make the changes in their parenting that would provide a physically, psychologically and developmentally safe environment for the children.

{¶ 38} Finally, although appellant argues permanent custody should not have been granted because the grandmother is an appropriate placement, we find the court's decision to the contrary is supported by the evidence. The grandmother failed to file a motion for legal custody or to have a home study completed. She is living in a home with several other people and multiple pets. In addition, the grandmother does not have any proprietary rights to the home which is in foreclosure. We find no error in the trial court's determination on this issue.

{¶ 39} Accordingly, appellant's sole assignment of error is overruled.

{¶ 40} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.